IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC. | § § § | |
| Plaintiff, | § § | NO. 3-07-CV-0303-M |
| VS. | § § | |
| PHILLIPS SCREW COMPANY | § § | |
| Defendant. | § § | |

**FINDINGS AND RECOMMENDATION OF THE**
**<u>UNITED STATES MAGISTRATE JUDGE</u>**

Defendant Phillips Screw Company ("Phillips") has filed a motion to dismiss this patent declaratory judgment action for lack of personal jurisdiction and improper venue or, in the alternative, to transfer the case to Massachusetts federal court. Because the court lacks personal jurisdiction over Phillips, the motion to dismiss should be granted.

I.

Phillips is the owner by assignment of U.S. Patent No. 6,941,635 ("the '635 Patent"), which covers a fastener used to penetrate and secure an alternative lumber material, such as composite wood deck floorboards, to a base material, such as floor joists. (*See* Def. Mot. App., Sable Decl. at 1-2, ¶ 3 & Exh. 1). Unlike a standard fastener, which produces unwanted remnants or shavings when used to affix one workpiece to another, the patented fastener is designed in such a way that any remnants produced by rotation are forcibly driven into the surface of the material. (*Id.*, Exh. 1). Phillips does not manufacture or sell the fasteners covered by the '635 Patent. (*Id.*, Sable Decl. at 4, ¶ 15). Rather, it licenses its patented design and technology to approximately 80 non-exclusive

licensees worldwide, including two companies in Texas. The licensees, in turn, manufacture and distribute products that incorporate the Phillips design. (*Id.*, Sable Decl. at 4, ¶ 16).

PrimeSource Building Products, Inc. ("PrimeSource") is a Texas-based distributor of GRIP-RITE® deck screws. In a letter dated January 3, 2007, Phillips identified certain GRIP-RITE® screws that allegedly infringe the '635 Patent and threatened legal action unless PrimeSource stopped selling those products. (Plf. Resp. App. at 548).[1] PrimeSource responded by attempting to distinguish its deck screws from the patented invention and suggested to Phillips that a more expansive reading of claim limitations would render the '635 Patent invalid. (*Id.* at 550). Dissatisfied with that response, Phillips once again demanded that PrimeSource immediately cease-and-desist from selling the accused deck screws or face the possibility of litigation. (*Id.* at 551). On February 15, 2007, PrimeSource filed this action in Texas federal court seeking a declaration that its GRIP-RITE® deck screws do not infringe the '635 Patent and that the patent is invalid. After receiving a courtesy copy of the complaint, Phillips sued PrimeSource in Massachusetts federal court for infringement of the '635 Patent. Phillips now moves to dismiss the Texas declaratory judgment action for lack of personal jurisdiction and improper venue or, alternatively, to transfer the case to Massachusetts. The motion has been fully briefed by the parties and is ripe for determination.

II.

Federal Circuit law governs the issue of personal jurisdiction in patent infringement and declaratory judgment actions. *See Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Foundation*, 297 F.3d 1343, 1347 (Fed. Cir. 2002). Under Federal Circuit precedent, the assumption

---

[1] Under a prior agreement between the parties, Phillips released PrimeSource to sell or otherwise dispose of its "existing inventory of the Deck Screw product." The GRIP-RITE® deck screws identified in the January 3, 2007 cease-and-desist letter do not fall within the scope of that release. (*See* Plf. Resp. App. at 548).

of personal jurisdiction over a nonresident defendant involves a two-step inquiry. *See Hildebrand v. Steck Manufacturing Co.*, 279 F.3d 1351, 1354 (Fed. Cir. 2002); *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1358 (Fed. Cir. 1998). First, the defendant must be amenable to service of process under the forum state's long-arm statute. *Red Wing Shoe*, 148 F.3d at 1358. Second, the exercise of jurisdiction must comport with due process. *Id.* Because the Texas long-arm statute has been interpreted to extend as far as due process permits, *see American Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex. 2002), *cert. denied*, 123 S.Ct. 1271 (2003), the court limits its inquiry to whether the exercise of personal jurisdiction over Phillips comports with federal constitutional due process requirements. *See HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1307 (Fed. Cir. 1999); *Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 427 (Fed. Cir. 1996).

The due process requirements for exercising personal jurisdiction focus on whether the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (internal quotations omitted). These "minimum contacts" may be analyzed in terms of general or specific jurisdiction. *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). Specific jurisdiction exists when the contacts with the forum state arise from, or are directly related to, the cause of action. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985); *Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.*, 444 F.3d 1356, 1361 (Fed. Cir. 2006). General jurisdiction is proper when the nonresident has other "continuous and systematic" contacts with the forum unrelated to the pending

litigation. *Helicopteros Nacionales*, 104 S.Ct. at 1872; *Electronics for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (Fed. Cir. 2003), *cert. denied*, 124 S.Ct. 1085 (2004). If a defendant has sufficient minimum contacts with the forum, the court must consider whether the exercise of personal jurisdiction would "offend traditional notions of fair play and substantial justice." *Asahi Metal Industry Co., Ltd. v. Superior Court*, 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987), *quoting International Shoe*, 66 S.Ct. at 158.

Where, as here, the issue of personal jurisdiction is decided on affidavits and other written materials, a plaintiff need only make a prima facie showing that the defendant is subject to personal jurisdiction. *See Electronics for Imaging*, 340 F.3d at 1349 (citing cases). The court must accept the uncontroverted allegations of plaintiff's complaint as true and resolve any factual conflicts in favor of the plaintiff. *See id.* Once the plaintiff has satisfied its initial burden, the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Breckenridge Pharmaceutical*, 444 F.3d at 1363, *quoting Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir.), *cert. denied*, 115 S.Ct. 2277 (1995).

III.

Phillips contends that it lacks sufficient minimum contacts with Texas to support the exercise of either general or specific jurisdiction in this forum. In support of this assertion, Phillips points out that it is incorporated under Delaware law and headquartered in Massachusetts. (Def. Mot. App., Sable Decl. at 1, ¶ 1). The company is not registered or licensed to do business in Texas, does not maintain an office in Texas, has no employees living or working in Texas, owns no real or personal property in Texas, and does not have any bank accounts in Texas. (*Id.*, Sable Decl. at 3, ¶¶ 10-12). Phillips does not manufacture or sell any products. (*Id.*, Sable Decl. at 4, ¶ 15). Rather,

it designs and licenses proprietary fastener drive systems for aerospace and commercial applications. (*Id.*, Sable Decl. at 4, ¶ 13). The design work is conducted solely in Massachusetts and the agreements between Phillips and its non-exclusive licensees are governed by Massachusetts law. (*Id.*, Sable Decl. at 4, ¶¶ 14, 17).

Notwithstanding this evidence, none of which is controverted, PrimeSource argues that Phillips is subject to personal jurisdiction in Texas under three distinct theories: (1) a stream-of-commerce theory, (2) a general jurisdiction theory, and (3) a specific jurisdiction theory. The court will address each of these jurisdictional theories in turn.

A.

Personal jurisdiction over a nonresident defendant under the stream-of-commerce theory may be proper where the defendant "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98, 100 S.Ct. 559, 567-68, 62 L.Ed.2d 490 (1980). Over the years, lower courts have split over the exact requirements of the stream-of-commerce theory. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564 (Fed. Cir.), *cert. dism'd*, 115 S.Ct. 18 (1994) (citing cases). The Supreme Court reflected that split in *Asahi Metal*, where four justices felt that in order to exercise personal jurisdiction over a nonresident defendant, the defendant must not only place the product into the stream of commerce, but also must take some action "purposefully directed toward the forum State." According to those justices:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice

> to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Asahi Metal*, 107 S.Ct. at 1032 (O'Connor, J., joined by Rehnquist, C.J., Powell and Scalia, JJ.). By contrast, four other members of the Court believed that placing a product into the stream of commerce, without more, satisfies the requirements of due process:

> As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State.

*Id.* at 1034-35 (Brennan, J., concurring, joined by White, Marshall, and Blackmun, JJ.) . The Federal Circuit has declined to endorse one approach over the other. *See Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1322 n.7 (Fed. Cir. 2005) ("We have yet to decide whether Justice Brennan's standard is sufficient to satisfy due process, because we have yet to be presented with facts that do not meet the more rigorous standard adopted by Justice O'Connor."). Nonetheless, the Federal Circuit has relied on the stream-of-commerce theory in a number of cases to uphold the exercise of personal jurisdiction over a nonresident defendant. *See, e.g. Viam*, 84 F.3d at 428-29 (out-of-state defendant did not simply place its product into the stream of commerce, but "knowingly and intentionally exploited the California market through its exclusive distributor's advertising in California, and by establishing channels for providing regular

advice in California"); *North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1580 (Fed. Cir. 1994) (jurisdiction existed because defendants "voluntarily placed a substantial quantity of infringing articles into the stream of commerce conscious that they were destined for Illinois"); *Beverly Hills Fan*, 21 F.3d at 1565-66 (personal jurisdiction existed where defendant placed its products into the stream of commerce through an established distribution channel and knew the likely destination of the products).

1.

A key component of the stream-of-commerce theory is the existence of a product. Here, Phillips does not manufacture or sell any products. It merely designs proprietary fastener drive systems and licenses technology to other companies who manufacture and sell fasteners incorporating the Phillips design. Although PrimeSource recognizes that merely entering into a licensing agreement with a company that delivers products into the stream of commerce is insufficient to support the exercise of personal jurisdiction, *see Red Wing Shoe*, 148 F.3d at 1360, it argues that Phillips is no "mere licensor." Rather, PrimeSource maintains that quality control measures imposed by Phillips make its licensees more akin to "outsourced manufacturing vendors." (*See* Plf. Resp. at 10). Many of the patent license agreements between Phillips and its licensees contain quality control language. For example, the license agreement with LFC Industries, Inc. ("LFC"), a Texas company, provides:

> 5.01 LICENSOR agrees to furnish LICENSEE with technical and engineering information and specifications relating to Patented Screws which may be in LICENSOR'S possession as of the date first written above, and to supplement such information and specifications if and as additional information may come into LICENSOR'S possession.

> 5.02 LICENSEE'S right to sell or use Patented Screws shall not become effective until the LICENSEE has delivered to LICENSOR, representative samples of Patented Screws made by LICENSEE, for quality approval by LICENSOR. LICENSEE'S right to sell shall become effective immediately upon written approval of said samples by LICENSOR. LICENSOR shall promptly advise LICENSEE of its findings and, if the samples are disapproved, the reasons for disapproval and suggestions for correction of any defects in quality. Thereafter, LICENSEE shall at all times maintain the standards of quality specified by LICENSOR for the physical and performance characteristics of Patented Screws.
>
> 5.03 The LICENSEE agrees that at least once every four months, and upon LICENSOR'S reasonable demand, it shall forward to the LICENSOR representative samples of Patented Screws then being produced and sold by LICENSEE. LICENSOR shall be permitted to inspect LICENSEE'S manufacturing operations from time to time, for the purpose of and to the extent necessary for, determining compliance with paragraph 5.02 by LICENSEE. Failure by LICENSEE to take steps to correct quality defects as well as failure to comply with any other provision of this Article [ ] shall constitute a ground for termination of the agreement.

(Plf. Resp. App. at 182-83).[2] Significantly, neither this license agreement, nor any of the other license agreements contained in the record, cover the '635 Patent. For that reason alone, PrimeSource has failed to prove that Phillips delivered its patented product into the stream of commerce with the expectation that it would be purchased by Texas consumers. *See World-Wide Volkswagen*, 100 S.Ct. at 567-68. Moreover, the court is unaware of any authority which holds that providing technical and engineering information, testing and inspecting product samples, and making regular visits to the manufacturing facilities of licensees is tantamount to placing a product into the stream of commerce. *See Camo-Clad, Inc. v. Latent Image, Inc.*, No. 00-C-278, 2000 WL 343324 at *3 (N.D. Ill. Mar. 31, 2000). The fact remains that Phillips does not manufacture or sell

---

[2] Phillips argues that these quality control measures are unique to trademark license agreements. (*See* Def. Reply at 4). However, the patent license agreement between Phillips and LFC contains many of the same quality control provisions.

any products. The license agreements at issue merely give licensees the right to use the patented technology to manufacture their own products under the Phillips brand name without the risk of being sued by Phillips. Since a covenant not to sue is not a product sold in the stream of commerce, personal jurisdiction cannot be predicated on that theory. *See Nordica USA Corp. v. Ole Sorensen*, 475 F.Supp.2d 128, 139 (D.N.H. 2007), *citing Red Wing Shoe*, 148 F.3d at 1362; *Camo-Clad*, 2000 WL 343324 at *2. *Cf. Motorola, Inc. v. PC-Tel, Inc.*, 58 F.Supp.2d 349, 354 n.7 (D. Del. 1999) (noting that the "determinative factor" in *Red Wing Shoe* was "the fact that the defendant there had placed nothing into the stream of commerce.").

2.

PrimeSource further argues that Phillips has established a national distribution network through its subsidiary, Phillips Fastener Products, Inc. ("PFP"), for the sale of products to "big-box" hardware stores. The evidence shows that Phillips formed PFP for the purpose of distributing proprietary fasteners, manufactured by its global license network, to retail consumer markets in North America. (*See* Plf. Resp. App. at 21-22, 129, 156-60). Two lines of Phillips-branded products, DECK MATE® and PHILLIPS II®, are sold in Texas by Home Depot and Lowe's. Home Depot sells more than $4 million of DECK MATE® products and Lowe's sells more than $4 million of PHILLIPS II® products each year in their Texas stores. (*See id.* at 419-22, ¶¶ 3-5, 14). Thus, the question becomes whether the contacts of PFP, who delivers products into the stream of commerce with the expectation that they will reach Texas consumers, can be imputed to Phillips.

In *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544 (Fed. Cir. 1990), the Federal Circuit recognized that a court may exert its equitable powers and pierce the corporate veil to "prevent fraud, illegality, injustice, a contravention of public policy, or prevent the corporation

from shielding someone from criminal liability." *Id.* at 552. However, the court must "start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." *Id.*, *quoting Zubik v. Zubik*, 384 F.2d 267, 271-72 (3d Cir. 1967), *cert. denied*, 88 S.Ct. 1183 (1968). While the Federal Circuit has not addressed what "specific" or "unusual circumstances" might justify piercing the corporate veil for the purpose of establishing personal jurisdiction over a parent corporation based on the contacts of its subsidiary, another judge in this district has identified seven factors relevant to such a determination: (1) the amount of stock owned by the parent of the subsidiary; (2) the existence of separate headquarters; (3) common officers and directors; (4) observation of corporate formalities; (5) maintenance of separate accounting systems; (6) exercise of general policy of the subsidiary; and (7) exercise of authority over daily operations of the subsidiary. *See Nutrition Physiology Corp. v. Enviros Ltd.*, 87 F.Supp.2d 648, 655-56 (N.D. Tex. 2000) (Cummings, J.), *citing Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983).

Here, the evidence shows that PFP is a wholly-owned subsidiary of Phillips. (Plf. Resp. App. at 12). The two companies maintain separate offices and, with the exception of Josephine Hodgdon, who serves as treasurer for both Phillips and PFP, have different corporate officers. (*See id*. at 12, 16-17). There is no evidence that Phillips and PFP combine their accounting systems, ignore corporate formalities, or exercise authority over the daily operations of one another. Despite this failure of proof, PrimeSource argues that the jurisdictional contacts of PFP should be imputed to Phillips because: (1) Arnold Craven, the inventor of the '635 Patent, is an employee of PFP; (2) Gary M. Sable serves as managing director of both Phillips and PFP; (3) a purchase agreement for screws covered by the '635 Patent refers to the two companies collectively as "Phillips;" and (4)

John Perry, a former buyer for Home Depot who now works for PrimeSource, believed that Phillips and PFP were a single entity. (*Id.* at 74, 360-66, 502-03).[3] Whatever probative value this evidence may have in another context, it is insufficient to pierce the corporate veil for jurisdictional purposes. *See, e.g. 3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373, 1380 (Fed. Cir. 1998) (finding no personal jurisdiction over parent of a subsidiary that was subject to personal jurisdiction where parent directed no activities toward residents of forum state); *Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998) (affirming dismissal for lack of personal jurisdiction of parent corporation); *Hill-Rom Services, Inc. v. Verses Technology, Inc.*, No. 1-03-CV-1227, 2006 WL 1540851 at *7-8 (M.D.N.C. Jun. 2, 2006) (declining to impute jurisdictional contacts of subsidiary to parent where plaintiff failed to produce evidence that parent exercised control over activities of its subsidiary or oversaw the distribution of allegedly infringing products); *Benjamin Obdyke Inc. v. Owens Corning*, No. 02-CV-8408, 2004 WL 870701 at *2-3 (E.D. Pa. Mar. 29, 2004) (dismissing holding company from patent infringement action because its relationship to the accused product manufactured by its subsidiary was "too attenuated to confer personal jurisdiction").

Nor is there any evidence that PFP was formed to insulate Phillips from defending declaratory judgment actions in distant forums. It is true that a parent company cannot "incorporate a holding company in another state, transfer its patents to the holding company, arrange to have those patents licensed back to itself by virtue of its complete control over the holding company, and threaten its competitors with infringement without fear of being a declaratory judgment defendant[.]"

---

[3] PrimeSource also argues that Phillips and PFP have some kind of "joint arrangement" with Lowe's to source Phillips products and to provide Lowe's with the exclusive use of Phillips trademarks in the United States. (*See* Plf. Resp. at 12). However, it is clear from the deposition testimony of Gary M. Sable that the only "arrangement" is between Lowe's and PFP. (*See* Plf. Resp. App. at 21-22).

*Dainippon Screen Manufacturing Co. v. CFMT, Inc.*, 142 F.3d 1266, 1270-71 (Fed. Cir. 1998). However, PrimeSource does not allege, much less prove, such conduct in this case. *Cf. GSK Technologies, Inc. v. Schneider Electric, S.A.*, No. 6-06-CV-361, 2007 WL 788343 at *7 (E.D. Tex. Mar. 14, 2007) (finding personal jurisdiction over parent corporation who placed infringing products into the stream of commerce through its subsidiary); *Marshall Packaging Co., LLC v. Nestle Waters North America, Inc.*, No. 6-05-CV-295, 2006 WL 871015 at *5 (E.D. Tex. Mar. 24, 2006) (same). PrimeSource has failed to meet its burden of establishing personal jurisdiction over Phillips under the stream-of-commerce theory.

B.

In addition to its stream-of-commerce argument, PrimeSource contends that Phillips has sufficient has sufficient minimum contacts with Texas to support the exercise of general jurisdiction. A federal court has general jurisdiction "when a defendant maintains 'continuous and systematic' contacts with the forum state even when the cause of action has no relation to those contacts." *LSI Industries Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000), *citing Helicopteros Nacionales*, 104 S.Ct. at 1872-73. However, such unrelated contacts must be "so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely different from those activities." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.*, 62 Fed.Appx. 322, 336, 2003 WL 1795641 at *12 (Fed. Cir. Apr. 1, 2003), *quoting International Shoe*, 66 S.Ct. at 159. Neither the Supreme Court nor the Federal Circuit has outlined a specific test to follow when analyzing whether a defendant's activities within a state are "continuous and systematic." Instead, a court must look at the facts of each case to make such a determination. *See LSI Industries*, 232 F.3d at 1375.

The evidence in this case does not approach the type of "continuous and systematic" contacts necessary to establish general jurisdiction. Of the more than 80 non-exclusive licensees of Phillips technology, only two are located in Texas--RKR Technologies, Inc. ("RKR") and Ameritech Fastener Manufacturing, Inc. ("AFM"). (*See* Plf. App. at 261-93, 294-328, 406).[4] As permitted by the license agreements, Phillips regularly inspects Phillips-branded products manufactured by RKR and AFM. If the products do not conform to specified design standards, Phillips has the right to demand corrective action. (*See id.* at 261, 265, 268-69, 272-73, 274). The license agreements also permit Phillips to inspect the manufacturing facilities of its licensees and in 2004, a Phillips representative traveled to Arlington, Texas to visit the RKR plant. (*Id.* at 410). The only other evidence adduced by PrimeSource relevant to the issue of general jurisdiction shows that Phillips engaged in limited marketing activities in Texas between 2004 and 2005. Those activities consisted of sending a sample of Phillips-branded nose bits and a quote from a licensed manufacturer to Peterbilt Motors Corporation in Denton, Texas (*see id.* at 329), meeting with American Airlines representatives in Dallas and Continental Airlines representatives in Houston to promote the use of Phillips-branded products (*see id*. at 333-34, 336-37), sponsoring a booth at a convention in Houston (*see id*. at 64, 333-34), and attending trade shows in Dallas, Houston, and San Antonio (*see id.* at 330-37). Even when all these activities are considered together, they do not justify exercising general jurisdiction over Phillips. *See Helicopteros Nacionales*, 104 S.Ct. at 1874 (exercise of general jurisdiction improper even where defendant's contacts with Texas included negotiating a contract in Texas, accepting checks drawn on a Texas bank, purchasing close to 80% of its helicopter fleet and other parts and accessories in Texas, and sending pilots to Texas for training).

---

[4] Ameritech is a successor-in-interest to another Texas company, M-Manufacturing Inc. (*See* Plf. Resp. App. at 60, 406). RKR and its LFC Industries Division have been Phillips licensees since at least 1986. (*Id.* at 178-94, 406).

*Compare Alien Technology Corp. v. Intermec, Inc.*, No. 3-06-CV-51, 2007 WL 63989 at *5 (D.N.D. Jan. 4, 2007) (finding "continuous and systematic" contacts where defendant registered as a foreign business corporation in the forum state, sold products directly to businesses in the forum state, paid income taxes in the forum state, realized more than $2 million from direct sales in the forum state, and traveled to the forum a consistent basis for business over a six-year period).

C.

Finally, PrimeSource seeks to establish specific jurisdiction over Phillips. A federal court may assume specific jurisdiction over a nonresident defendant who "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239-40, 2 L.Ed.2d 1283 (1958). In determining whether the exercise of specific jurisdiction is proper, the Federal Circuit considers: (1) whether the defendant "purposefully directed" its activities at residents of the forum; (2) whether the claim "arises out of or relates to" the defendant's activities in the forum; and (3) whether the exercise of jurisdiction is "reasonable and fair." *See Breckenridge Pharmaceutical*, 444 F.3d at 1363; *Deprenyl Animal Health*, 297 F.3d at 1347. "The first two factors correspond with the 'minimum contacts' prong of the *International Shoe* analysis, and the third factor corresponds with the 'fair play and substantial justice' prong of the analysis." *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001).

PrimeSource argues that Phillips has met the "purposeful availment" requirement by sending two cease-and-desist letters to PrimeSource's attorney in Texas threatening litigation over the sale of certain GRIP-RITE® deck screws and by exercising control over the activities of its Texas licensees. It is well-settled that sending cease-and-desist letters and merely entering into a patent

license agreement, "without more," are not sufficient contacts to satisfy the due process clause. *See Breckenridge Pharmaceutical*, 444 F.3d at 1363, *citing Red Wing Shoe*, 148 F.3d at 1360. In an effort to clarify what "more" will suffice where specific jurisdiction is predicated on a cease-and-desist letter or a license agreement, the Federal Circuit wrote:

> [A] defendant is subject to personal jurisdiction in the forum state by virtue of its relationship with its exclusive forum state licensee if the license agreement, for example, requires the defendant-licensor, and grants the licensee the right, to litigate infringement claims . . . [T]he defendant will also be subject to personal jurisdiction in the forum state if the exclusive licensee (or licensee equivalent) with which it has established a relationship is not headquartered in the forum state, but nonetheless conducts business there.

*Id.* at 1366 (internal citations omitted). As previously noted, none of the license agreements between Phillips and its Texas licensees relate to the '635 Patent. Instead, the agreements with RKR and its LFC Industries Division involve U.S. Patent Nos. 4,084,478 ("the '478 Patent") and 4,187,892 ("the '892 Patent"), as well as certain Phillips trademarks (*see* Plf. App. at 178-86, 187-94, 195-206, 208-25, 227-42, 243-59), while the agreement with M-Manufacturing involves the '892 Patent and certain trademarks (*see id*. at 317-28). Because the license agreements do not "arise out of" or "relate to" the subject matter of this litigation, specific jurisdiction cannot be predicated on the agreements. In addition, none of the license agreements between Phillips and its Texas licensees, or any of its other licensees, are exclusive. In every case where a court has upheld the exercise of specific jurisdiction over a nonresident defendant based on a patent license agreement, exclusivity was a paramount consideration. *See Breckenridge Pharmaceutical*, 444 F.3d at 1365; *Inamed*, 249 F.3d at 1362; *Genetic Implant Systems, Inc. v. Core-Vent Corp.*, 123 F.3d 1455, 1457 (Fed. Cir. 1997); *Akro Corp.*, 45 F.3d at 1543; *JoeScan, Inc. v. LMI Technologies, Inc*., No. C-07-5323-RJB, 2007 WL 2572297 *2 (W.D. Wash. Sept. 5, 2007). *Cf. Red Wing Shoe*, 148 F.3d at 1361-62

(non-exclusive licensing agreement did not give rise to specific personal jurisdiction over nonresident defendant); *Majestec 125, LLC v. Sealift, Inc.*, No. 1-06-CV-104, 2006 WL 2039984 at *4 (W.D. Mich. Jul. 19, 2006) (same); *Measurement Computing Corp. v. General Patent Corp. Intern.*, 304 F.Supp.2d 176, 181-82 (D. Mass. 2004) (same); *Oacis Health Care Systems, Inc. v. Allcare Health Management Systems, Inc.*, No. C-99-5112-VRW, 2000 WL 550040 at *2 (N.D. Cal. Apr. 25, 2000) (same); *Camo-Clad*, 2000 WL 343324 at *3 (same); *Cognex Corp. v. Lemelson Medical, Educ. & Research Foundation, Ltd. Partnership*, 67 F.Supp.2d 5, 8-9 (D. Mass. 1999) (same); *Stairmaster Sports/Medical Products, Inc. v. Pacific Fitness Corp.,* 916 F.Supp. 1049, 1057 (W.D. Wash. 1994), *aff'd.*, No. 95-1232, 95-1255, 78 F.3d 602 (Fed. Cir. Jan. 31, 1996) (table) (same).  Thus, PrimeSource is left with nothing more than the two cease-and-desist letters sent by Phillips to attorneys in Texas.  Those letters, standing alone, are insufficient to support the exercise of specific jurisdiction.[5]

## **CONCLUSION**

Defendant's motion to dismiss for lack of personal jurisdiction [Doc. #9] should be granted.

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party may file written objections to the recommendation within 10 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  The failure to file written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon

---

[5] The resolution of this jurisdictional issue pretermits consideration of Phillips' motion to dismiss for improper venue or, in the alternative, to transfer venue to Massachusetts federal court.  However, if required to decide the venue issue, the court would be inclined to transfer this declaratory judgment action to Massachusetts for possible consolidation with the infringement suit brought by Phillips in that district.

grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: October 4, 2007.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE